```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

BERT COHEN,                            :

                    Plaintiff,         :    07 Civ. 535 (DAB)(HBP)

    -against-                          :
                                            REPORT AND
MICHAEL J. ASTRUE,                     :    RECOMMENDATION
Commissioner of Social Security,
                                       :

                    Defendant.         :
                                       :
----------------------------------X
```

PITMAN, United States Magistrate Judge:

TO THE HONORABLE DEBORAH A. BATTS, United States District Judge,

I.  Introduction

Plaintiff, Bert Cohen, brings this action pursuant to Section 205(g) of the Social Security Act ("SSA"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Item 10).  For the reasons set forth below, I respectfully recommend that the Commissioner's motion be granted.

II.  Background

    A.  Procedural Background

        Plaintiff filed an application for DIB on July 12, 1994 alleging that he had been disabled due to a back injury he suffered on December 23, 1985 (Tr.[1] 60-63).  The Social Security Administration denied plaintiff's application for benefits on October 7, 1994, finding that plaintiff could perform "light work" (Tr. 68).  This decision was affirmed after reconsideration (Tr. 70-82).  Plaintiff timely requested (Tr. 83) and was granted a hearing before an Administrative Law Judge ("ALJ"), which took place on October 17, 1995 (Tr. 128-29).  In a decision dated February 28, 1996, the ALJ found that plaintiff had not been under a disability within the meaning of the SSA from December 23, 1985 through March 31, 1990, the period during which plaintiff met the SSA's insured status requirement ("the Critical Period") (Tr. 158-65).

        After plaintiff requested review (Tr. 166), the Appeals Council ordered the decision be vacated and the case be remanded so that the ALJ could evaluate a report by Dr. George Weinberger,

_____

    [1]"Tr." refers to the administrative record that the Commissioner filed as part of his answer, as required by 42 U.S.C. § 405(g).

2

plaintiff's cousin, which plaintiff submitted after the hearing (Tr. 171-74).  The ALJ was to clarify the nature of Dr. Weinberger's treatment relationship with plaintiff and secure his relevant records (Tr. 173).  After receiving a letter from Dr. Weinberger, the ALJ concluded that he had treated plaintiff on a sporadic basis, but not for the impairments at issue (Tr. 178-80, 191).  In a February 17, 1998 decision, the ALJ again concluded that plaintiff was not disabled (Tr. 186-96).

After the Appeals Council denied plaintiff's request to review this decision on November 7, 2000 (Tr. 197-98, 201-03), plaintiff filed a complaint in the United States District Court in the Southern District of Florida.  The Commissioner moved for and was granted a remand of the case for further administrative proceedings because the hearing tape could not be located (Tr. 204-07).  The Appeals Council vacated the final decision and remanded it to an ALJ to offer plaintiff a de novo hearing (Tr. 209-10), which was conducted on October 16, 2002 (Tr. 219-38).

In a decision dated November 14, 2002, the ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform the full range of sedentary work and was, therefore, not disabled during the Critical Period (Tr. 239-50).  Plaintiff requested review by the Appeals Council (Tr. 254-55) which again remanded the case on December 8, 2003, stating that the ALJ did

not support his finding with specific medical opinion evidence, and there was evidence from plaintiff and his treating physicians which undermined his conclusion.  The Appeals Council also noted that plaintiff had applied for and was granted SSI benefits on May 23, 2003 upon a determination that he had been disabled since May 1, 2003.  Accordingly, the Appeals Council concluded that the ALJ should obtain testimony from a medical expert and offer plaintiff a supplemental hearing (Tr. 265-69).

Plaintiff's third and final hearing was conducted on November 3, 2004 (Tr. 477-527).  In a decision dated December 21, 2004, the ALJ again found that plaintiff was not disabled during the Critical Period (Tr. 27-35).  This determination became the final decision of the Commissioner on November 8, 2006 when the Appeals Council denied plaintiff's request for review (Tr. 9-10).

Plaintiff commenced the present action on January 24, 2007 (Complaint, dated December 26, 2006 (Docket Item 2), ("Compl.")) by submitting a form complaint stating "[t]he decision of the [ALJ] was erroneous, not supported by substantial evidence on the record, and/or contrary to the law" (Compl. ¶ 9).  On October 26, 2007, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Notice of Motion for Judgment on the Pleadings, dated October 26, 2007 (Docket Item 10); Memorandum of Law in Support

4

of Defendant's Motion for Judgement on the Pleadings, dated
October 26, 2007 (Docket Item 9), ("Def.'s Mem. in Supp.")).  On
December 9, 2010, I directed that plaintiff have until January 4,
2011 to submit argument or other materials in support of his
complaint or in opposition to the Commissioner's motion (Docket
Item 11).  Plaintiff submitted letters on December 30, 2010 and
May 7, 2011 enclosing a 2010 application for a parking permit for
persons with severe disabilities, as well as medical records from
2010 and 2011.  Because these records were created after the
Critical Period, they are not relevant to this review.

> B.  Plaintiff's
>     Social Background

Plaintiff was born on March 15, 1945 (Tr. 224).  He is
a high school graduate and was divorced at the time of his
original filing (Tr. 61, 224, 314).  He did not report having any
children in his original application, but the record includes a
2003 questionnaire completed by his daughter (Tr. 61, 320-21).

Plaintiff worked as a "T.V. Technician" in a television
repair shop from 1970[2] until his injury in 1985[3] (Tr. 92).  He

---

[2]In his subsequent 2003 Disability Report, plaintiff claims
that he worked in this capacity beginning in 1966 (Tr. 309).

[3]Plaintiff dated his first Disability Report June 23, 1984
(Tr. 88-93).  I will assume plaintiff intended to write 1994
since he indicated on the form that his injury occurred on

used machines, tools, and equipment, had technical knowledge and skills, wrote, completed reports and performed similar duties (Tr. 92). He did not have supervisory responsibilities (Tr. 92, 309). Plaintiff's primary duties included television repair house calls and bringing televisions from customers' homes to his shop (Tr. 92, 226). He prepared bills for this work as well (Tr. 92). Plaintiff spent one hour per day walking, three hours standing, four hours sitting and frequently had to bend and reach[4] (Tr. 93). He frequently lifted objects weighing fifty pounds[5], which was the maximum weight he lifted. He most often lifted a tool box, picture tubes and television sets (Tr. 93).

---

December 23, 1985 (Tr. 88).

[4]In his 2003 Disability Report, plaintiff reported that he spent two hours per day walking, two hours sitting, two hours stooping, one hour kneeling, one hour crouching, one hour handling, grabbing or grasping big objects and one hour handling small objects. He reported that he did not stand, climb, crawl or reach (Tr. 309).

[5]At his 2002 hearing, plaintiff claimed that the heaviest weight he lifted was one hundred fifty pounds (Tr. 225). In his 2003 Disability Report, plaintiff indicated that the heaviest weight he lifted was fifty pounds, but he more frequently lifted twenty-five pounds (Tr. 309).

C.  Plaintiff's
    Medical Background

    1.  Information
        Reported by Plaintiff

Plaintiff originally claimed that his back injury caused muscle spasms, pain and some loss of feeling in his legs (Tr. 88).  He stated that he worked for two months following his injury until his condition worsened[6].  He was then unable to lift, bend, or sit in one position for an extended period of time, or perform television repairs (Tr. 88, 98).  Plaintiff originally reported that he was able to cook and "do some light shopping" but did not clean, perform odd jobs, make his bed, vacuum, or do laundry (Tr. 91, 229).  He could, however, take out light garbage, retrieve his mail and care for his personal hygiene, which he claimed took "a long period of time"[7] (Tr. 229-30).

Plaintiff testified in 2002 that he played sports before his injury, but was no longer able to do so (Tr. 231).  He was also unable to go to the movies because he could not sit for

---

[6]Plaintiff noted in his Disability Report that he had symptoms on November 23, 1985, though he reported elsewhere that his injury occurred on December 23, 1985 (Tr. 88).

[7]Plaintiff described more extensive limitations in his 2003 Disability Report than those described in his initial application and in his 2002 hearing testimony (Tr. 318-19).

7

a prolonged period, but he was able to visit friends and drive a car (Tr. 91).  He "very, very occasionally" went out to eat, but could not go to the shopping mall, religious services, or play cards (Tr. 230-31).  He usually spent his days laying on his couch or taking the bus to "the clubhouse" (Tr. 231).

Plaintiff reported that Dr. Weinberger was his initial treating physician.  He recalled that Dr. Weinberger sent him for an electromyography[8] ("EMG") at Englewood Hospital after plain-tiff "found [himself] barely able to move and lost feeling in [his] right leg in Nov. 1985" (Tr. 89).  Dr. Donald Liss primar-ily treated the impairments at issue (Tr. 89, 232, 236).  Plain-tiff reported seeing Dr. Liss several times per year, beginning in 1988, to receive physical therapy for back pain (Tr. 89, 233). He also saw Dr. Kenneth Falvo for physical therapy (Tr. 89).  In his 1996 Reconsideration Disability Report, he reported that he had "high triglycerides[9], below level HD [and] cholesterol[,]"

---

[8]Electromyography refers to an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation; performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals. Dorland's Illustrated Medical Dictionary, 609 (31st ed. 2007) ("Dorland's").

[9]Triglyceride refers to a compound consisting of three molecules of fatty acid esterified to glycerol; it is a neutral fat synthesized from carbohydrates for storage in animal adipose cells.  See Dorland's at 1992.

increasing arthritis[10] and continuing muscle spasms in his back (Tr. 96).

At his 2002 hearing, plaintiff testified that his condition at that time was the same as it was in 1985 (Tr. 225, 233).  He claimed he had a herniated[11] disc in his neck and that his back was "dysfunctional" (Tr. 224).  He also claimed that surgery was never recommended because his injury was too close to his spinal cord (Tr. 225).  He reported frequent pain in his upper and lower back as well as in his fingers, which he quantified as a ten on a one-to-ten scale.  He claimed that Naprosyn[12] relieved his pain, but caused drowsiness (Tr. 226-27).

Plaintiff further testified that Dr. Liss' physical therapy treatment consisted mostly of "deep muscle massage" and exercises in which plaintiff leaned against a large ball and moved it up and down a wall (Tr. 234-35, 488).  He denied that he

---

[10]Arthritis refers to the inflammation of a joint.  See Dorland's at 152.

[11]Herniated refers to something which is protruding like a hernia or enclosed in a hernia.  A hernia refers to the protrusion of a loop or knuckle of an organ or tissue through an abnormal opening.  See Dorland's at 859, 862.

[12]Naprosyn refers to the trademark for preparation of naproxen.  Naproxen is a nonsteroidal antiinflammatory drug that is a propionic acid derivative, used in the treatment of pain, inflammation, osteoarthritis, rheumatoid arthritis, gout, calcium pyrophosphate deposition disease, fever, and dysmenorrhea and in the prophylaxis and suppression of vascular headache.  See Dorland's at 1251.

could perform sit-ups, despite a note in his medical records which indicated that he had (Tr. 235-36, 488-89). Plaintiff further testified that he could lift less than five pounds during the Critical Period, but rarely did. He could walk comfortably for five minutes, or the length of a city block, and could stand or sit comfortably for ten to fifteen minutes. He claimed he was unable to bend, push, pull, kneel, crouch or climb stairs. He was able to reach in front of him, with some pain (Tr. 227-28).

In his 2003 Disability Report, plaintiff claimed that he could not lift, sit or stand "in any position for a period of time" (Tr. 308). He stated that he stopped working in December 1985 due to "back [and] nerve problems [and] injuries" (Tr. 308). He also claimed at that time that he had constant "severe sharp pains" in his lower back and numbness in his toes and feet (Tr. 317).

At his hearing in 2004, plaintiff testified that he had also been taking Flexeril[13] since 1988 (Tr. 482). He recalled that at some point he was examined by Dr. Abe Steinberger, a neurosurgeon, who concluded after an EMG that there was nerve

---

[13]Flexeril is the trademark for a preparation of cyclobenzaprine hydrochloride, which is a compound structurally related to the tricyclic antidepressants, used as a skeletal muscle relaxant for relief of painful muscle spasms. See Dorland's at 463.

damage in plaintiff's lower back which "created a problem in
[his] toes" causing numbness (Tr. 483-84). Plaintiff testified
that Dr. Steinberger referred him back to Dr. Liss to continue
physical therapy (Tr. 484). Plaintiff also testified that he
suffered pain and numbness in his hands, causing him to drop
things, and had pain in his lower back, neck, and knee which
equaled a nine on a one-to-ten scale (Tr. 485). At this hearing,
he reported that he could not get out of bed in the morning,
often got dizzy and spent a substantial amount of time sleeping
on the couch (Tr. 486). He testified that he could not concen-
trate on television shows, but that his memory was not impaired
(Tr. 486-87). He felt depressed, but had not been treated for
depression (Tr. 488).

When asked specifically to recall his condition during
the Critical Period, plaintiff first claimed that he had been
unable to carry anything in 1990, but then testified that he
could carry light items under five pounds (Tr. 511). He claimed
that at that time he could only walk about twenty to thirty feet
before his lower back and neck began to ache (Tr. 512). He could
lightly food shop and stand for about fifteen minutes, but could
not sit still for very long, nor could he bend, push, pull,
kneel, crouch, climb stairs or perform household chores (Tr. 513-

11

14).  His "life was basically at home laying [sic] on the couch watching a television show" unable to concentrate (Tr. 514).

## 2.  Treatment Records

The administrative record includes medical documenta-tion of plaintiff's treatment up until the time of his most recent hearing in 2004.  I will address only those records concerning the Critical Period.

### a.  Dr. George Weinberger

Much of Dr. Weinberger's records consist of summaries of plaintiff's treatment by other physicians.  Dr. Weinberger dictated such a report to the Chief Medical Consultant of the New York State Department of Social Services on September 2, 1994 (Tr. 124-26).  He noted that in 1985 plaintiff had "degen-erative[14] osteophyte[15] mid and lower thoracic[16] spine x-rays" (Tr. 125).  He also noted that plaintiff was evaluated by Dr. Hanson,

---

[14]Degenerative pertains to degeneration, which refers to deterioration or change from a higher to a lower form; especially change of tissue to a less functionally active form.  See Dorland's at 486, 488.

[15]Osteophyte refers to a bony excrescence or osseous outgrowth.  See Dorland's at 1369.

[16]Thoracic pertains to the thoracic portion of the spinal column.  Thoracic pertains to the thorax, or chest.  See Dorland's at 1945.

a chiropractor, that year.  Plaintiff had a knee x-ray in 1986
showing "no structural change" (Tr. 125).  Dr. Weinberger added
that plaintiff saw Drs. Grueber and Sabato in May 1986 in con-
junction with his Workman's Compensation claim concerning "a
right-sided sciatica[17] L5-S1 radiculopathy[18] bilaterally" (Tr.
125).  He also noted that in January 1986, Dr. Ulysses Sabato, a
neurologist working with Drs. Gruber and Sabato, found that
"abnormalities of nerve conduction studies and electromyelogram
suggest the presence of L5-S1 radiculopathy" (Tr. 126).

Dr. Weinberger also reported that plaintiff had seen
Dr. Donald Liss in 1989 and began taking muscle relaxants and
anti-inflammatories following a normal EMG.  In 1990, Dr. Liss
informed him that plaintiff had stiffness and pain in his
"parathoracic musculature" but an MRI did not show thoracic disc
herniation (Tr. 125).  Dr. Weinberger also noted that prior to an
examination by Dr. Liss in 1993, plaintiff had "multiple trigger
points" (Tr. 125).

---

[17]Sciatica refers to a syndrome characterized by pain
radiating from the back into the buttock and into the lower
extremity along its posterior or lateral aspect, and most
commonly caused by protrusion of a low lumbar intervertebral
disc; the term is also used to refer to pain anywhere along the
course of the sciatic nerve.  See Dorland's at 1703.

[18]Radiculopathy refers to a disease of the nerve roots.  See
Dorland's at 1594.

Dr. Weinberger also discussed Dr. Abe Steinberger's treatment of plaintiff in 1989.  At that time, plaintiff complained of "increasing neurologic symptoms" and increased numbness of the hands extending to his arms and elbows, as well as "pathology[19] involving the side of his trunk" (Tr. 125).  An EMG of his upper extremities was normal.  Dr. Steinberger recommended conservative therapy, while Dr. Weinberger stated that because an MRI showed "what appears to be a herniated disc[,]" plaintiff should have[20] had a "myelogram[21] followed by a CT scan . . . to document the presence [of] significant cord compression[22]" (Tr. 125).

Dr. Weinberger completed an RFC report for plaintiff on October 30, 1996 stating that, in an eight hour day, plaintiff could sit for one hour or less and stand or walk for one hour, and could occasionally lift and carry less than five pounds (Tr.

---

[19]Pathology refers to the structural and functional manifestations of disease.  See Dorland's at 1416.

[20]It is unclear if Dr. Weinberger was discussing his own recommendation or that of Dr. Steinberger.

[21]Myelogram refers to a radiograph of the spinal cord.  See Dorland's at 1238.

[22]Cord compression refers to a condition in which pressure is exerted on the spinal cord, as by a tumor, spinal fracture, etc.; its manifestations, which vary with location and degree of pressure, may include pain, parathesias, and sensory and motor disturbances.  See Dorland's at 405.

14

167).  Dr. Weinberger also opined that plaintiff could bend, climb steps and reach, on occasion.  He could use his hands for grasping and "fine manipulations" but not for pushing or pulling (Tr. 167).  Dr. Weinberger restricted plaintiff from unprotected heights, moving machinery, and exposure to marked changes in temperature and humidity, but would allow him to moderately drive and be exposed to dust, fumes and gases (Tr. 168).  He further noted that plaintiff had pain and difficulty dealing with low and moderate levels of stress.  His medications caused drowsiness and nausea, but not impaired concentration or irritability (Tr. 168).  Finally, Dr. Weinberger stated that his last examination of plaintiff was in October 1996 (Tr. 168).  Dr. Weinberger did not state whether this report pertained to plaintiff's RFC during the Critical Period or in 1996.

The record also includes a letter from Dr. Weinberger "To Whom it May Concern" written in 1997 in which he states that plaintiff "is totally disabled and has be since 0, 1986, [sic] the alleged onset date"[23] (Tr. 181).

---

[23]I will not describe the contents of the letter Dr. Weinberger sent to plaintiff's attorney and the ALJ following the Appeals Council's 1996 decision because it is not a treatment record, describes only the treatment of other physicians and is largely redundant of his September 1994 report (see Tr. 178-80).

15

b.   Dr. Donald Liss

Dr. Liss completed an initial medical report on Febru-ary 29, 1988 (Tr. 123).  He noted that plaintiff was forty-four years old and had injured his lower back lifting a television picture tube in January 1986 (Tr. 123).  He suffered from lower back pain which radiated down his right leg with an "associated numbness."  He noted that plaintiff had previously had two EMG's which showed "evidence of right L5-S1 radiculopathy" (Tr. 123). His CT scan had been normal.

Dr. Liss stated that plaintiff had received "modest" efforts at physical therapy "modalities[24]" including "moist heat and gentle massage" (Tr. 123).  Plaintiff complained of pain in his mid-thoracic region, but none in his lower back (Tr. 123). His thoracic spine films "indicated degenerative joint disease and spur[25] formation in the thoracic spine at multiple levels" (Tr. 123).  Plaintiff also complained of numbness in his right leg, and claimed not to have worked since his injury (Tr. 123).

---

[24]Modalities refer to a method of application of, or the employment of, any therapeutic agent, especially a physical agent.  See Dorland's at 1189.

[25]Spur refers to a spiked object or other type of goad.  See Dorland's at 807.

Dr. Liss also reported that "deep tendon[26] reflexes are 2+ and symmetrical[27]" and that "there is diminished pinprick sensation in the right anterior thigh and in the right calf" (Tr. 123).  He noted that plaintiff was able to rise on his toes and heels and squat one leg at a time without difficulty.  There were no motor deficits in the lower or upper extremities, and plaintiff's "[s]traight leg raise [was] negative bilaterally" (Tr. 123).  Palpation[28] revealed tenderness "over the thoracic and upper lumbar[29] paraspinal muscles" and plaintiff had pain on "facet[30] Spring testing from T7 through T12" and discrete local tenderness in the "right quadratus lumborum and the right rhomboids" (Tr. 123).  Plaintiff also reported that he had gained

---

[26]Tendon refers to a fibrous cord of connective tissue by which a muscle is attached.  See Dorland's at 1904.

[27]Reflexes are often graded on a scale from zero to four; two plus indicates average (Def.'s Mem. in Supp. at 2), citing Neil M. Davis, MS, PharmD, FASHP, Medical Abbreviations 339 (10th ed. 2001).

[28]Palpation is the act of feeling with the hand; the application of the fingers with light pressure to the surface of the body for the purpose of determining the consistency of the parts beneath in physical diagnosis.  See Dorland's at 1386.

[29]Lumbar spine refers to that portion of the spine comprising the lumbar vertebrae.  See Dorland's at 1774.

[30]Facet refers to a small plane surface on a hard body, as on a bone.  See Dorland's at 676.

considerable weight around his waist and abdomen since his injury (Tr. 123).

Dr. Liss reported that plaintiff's neurological examination continued to be normal except for some diminished sensation in the right leg of "questionable significance" (Tr. 122). He determined that plaintiff's thoracic pain may be secondary to the "facet syndrome" at the mid to lower thoracic levels, and that he "probably has secondary myofascial[31] pain due to inactivity, lack of exercise, and paucity of treatment to this area" (Tr. 122). He noted that plaintiff would begin physical therapy three times per week consisting of modalities and "myofascial release and mobilization" (Tr. 122).

On March 28, 1988, Dr. Liss wrote to Dr. Weinberger stating that plaintiff was "doing quite a bit better with much less pain in his mid thoracic spine" (Tr. 121). He noted that plaintiff continued to have "diminished tone in his oblique abdominal muscles" but was "performing sit-ups" during which Dr. Liss could feel increased tone (Tr. 121). Plaintiff was "experiencing only a fraction of his original pain . . . . Thoracic

---

[31]Myofascial pertains to or involves the fascia surrounding and associated with muscle tissue. Fascia refers to a sheet or band of fibrous tissue such as lies deep to the skin or forms an investment for muscles and various other organs of the body. See Dorland's at 687, 1241.

18

spring testing in the facet joints [was] much less tender" and plaintiff's abdominal muscles had improved (Tr. 121). Dr. Liss planned for plaintiff to continue physical therapy and increase his physical exercise and, because he was "progressing nicely[,]" Dr. Liss would only consider soft tissue injections if plaintiff did not improve (Tr. 121).

Dr. Liss completed an Interim Medical Report on March 22, 1989. He stated that plaintiff returned to his office complaining of "increased symptoms along the length of his spine," and a "'pulling'" or "'drawing'" sensation down his arms (Tr. 120). Plaintiff also complained of tingling and numbness, mostly in his left arm (Tr. 120). Dr. Liss noted that "Spurling's maneuver[32][,]" "Phalen's maneuver[33]" and "Tinel's sign[34]" were all negative, and "[d]eep tendon reflexes were 2+ and

---

[32]Spurling's Maneuver tests for cervical pathology (Def.'s Mem. in Supp. at 5), citing Mark D. Miller, M.D. Review of Orthopedics 88-89 (2nd ed. 1996).

[33]Phalen's Maneuver, used for the detection of carpal tunnel syndrome, refers to when the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extending for 30 to 60 seconds, or by placing a sphygmomanometer cuff, an instrument for measuring blood pressure in the arteries, on the involved arm and inflating to a point between diastolic and systolic pressure for 30 to 60 seconds. See Dorland's at 1117, 1772.

[34]Tinel's sign refers to a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve. See Dorland's at 1741.

symmetrical.   There was diminished pinprick sensation in the left
hand which was of questionable significance.   Shoulder range of
motion was mildly decreased but of vague significance as well"
(Tr. 120).   Dr. Liss recommended an EMG and MRI to rule out
cervical and/or lumbar radiculopathy (Tr. 120).

On April 24, 1989, Dr. Liss wrote a letter stating that
plaintiff had undergone an MRI "which revealed stenosis[35] of
significant degree in the cervical region" and "had a positive
EMG which was again consistent with a C6-7 radiculopathy of the
left upper extremity" (Tr. 131).   He referred plaintiff to a
neurosurgeon and stated "I feel this patient's symptoms are of
significant severity that conservative treatment would probably
not be helpful" (Tr. 131).

Dr. Liss next wrote to Dr. Weinberger on June 2, 1989
stating that plaintiff had reported that his hands felt "'bet-
ter'" and less numb, but he still had spasms and the sensation of
"'hands crawling on his back[,]'" particularly when he flexed his
neck (Tr. 118, 144).   His examination was normal neurologically
and orthopedically.   Dr. Liss prescribed Flexeril and advised
plaintiff to take hot showers and perform certain stretches (Tr.
118, 144).   On this same date, Dr. Liss wrote a letter "To Whom

---

[35]Stenosis refers to an abnormal narrowing of a duct or
canal.   See Dorland's at 1795.

it May Concern" stating plaintiff was "disabled because of cervical radiculopathy and lumbar pain" (Tr. 119, 143).

On September 15, 1989, Dr. Liss completed a report in which he stated that plaintiff's "hands are '80 percent better'" and the symptoms in plaintiff's legs had disappeared two weeks before (Tr. 117). Plaintiff continued to complain of mid-thoracic pain, which he claimed had worsened during that month. The examination was negative neurologically. Dr. Liss again suggested that plaintiff take Flexeril and stretch following hot showers. He also noted that plaintiff was not receiving any physical therapy or rehabilitation (Tr. 117). On this same date, Dr. Liss composed another letter "To Whom it May Concern" stating that plaintiff was "disabled because of lumbar pain" (Tr. 130).

On March 19, 1990, Dr. Liss wrote to Dr. Weinberger to report that plaintiff complained of "persistent thoracic pain" but his lumbar and cervical regions improved (Tr. 116). Dr. Liss noted that "[e]xamination is still essentially normal except for tenderness to palpation along the parathoracic muscles" and an MRI of the thoracic spine would not be unreasonable to rule out any pathology in the area (Tr. 116). Dr. Liss received the results from this MRI on March 25, 1990 which stated that "no significant abnormalities are demonstrated in the thoracic spine. No evidence of thoracic disc herniation" (Tr. 145).

21

On April 2, 1990, Dr. Liss informed Dr. Weinberger that plaintiff's MRI was normal and that the "[t]horatic spine examination reveals positive facet spring testing and tenderness in parathoracic muscles" (Tr. 115).  He indicated that plaintiff would "undergo a brief course of physical therapy to the thoracic ligaments and muscles" including manual therapy and exercise (Tr. 115).  Dr. Liss later reported that plaintiff began physical therapy on April 4, 1990 and was "feeling much better" (Tr. 114).

### c.  Dr. Abe Steinberger

When Dr. Steinberger examined plaintiff on March 31, 1989, plaintiff's chief complaint was numbness in his hands and arms (Tr. 133).  Plaintiff reported that he was injured on December 21, 1985 but had maintained his "usual state of health until about two weeks" before the appointment when he began to notice numbness in his left hand extending to his wrist, and in his right hand extending to his shoulder.  Plaintiff felt that his dexterity had diminished, causing difficulty writing, and he had "some vague weakness of the left greater than right upper extremities, distal[36] worse than proximal[37]" (Tr. 133).  His

---

[36]Distal means remote; farther from any point of reference. See Dorland's at 562.

[37]Proximal means nearest; closer to any point of reference.
(continued...)

22

"chronic mild mid-neck pain" manifested as a dull, consistent, ache, but was unaffected by motion.  He denied weakness in the legs and his EMG from the week prior was normal.  Dr. Steinberger noted that plaintiff was a "well developed, well nourished man in no acute distress" (Tr. 133).  He reported that the following were negative:  vertebral tenderness, paraspinal tenderness, Lhermitte's sign[38], impingement sign at the shoulders, tenderness over the ulnar[39] nerves, tenderness over the median nerves, Tinel's sign and Phelan's sign.  Plaintiff's gait, station, heel[40], toe and tandem walk were normal (Tr. 133).

Dr. Steinberger noted that an MRI of the cervical spine from March 23, 1989 revealed "a rather large herniated disc at C4-C5, centrally and perhaps more to the left, with apparent impingement on the thecal sac" and "mild degenerative changes at

---

[37](...continued)
See Dorland's at 1562.

[38]Lhermitte's sign refers to the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward; seen mainly in multiple sclerosis but also in compression and other disorders of the cervical cord.  See Dorland's at 1738.

[39]Ulnar refers to the ulna, the inner and larger bone of the forearm, or to the medial (ulnar) aspect of the forearm as compared with the lateral (radial) aspect.  See Dorland's at 2026.

[40]Heel walk refers to a gait marked by walking on the heels to avoid the pain of pressure upon the ayperalgesic soles of the feet in cases of peripheral neuritis.  See Dorland's at 2102.

C6-7 and C5-6 with mild stenosis" (Tr. 134).  Dr. Steinberger

reported his impression as follows:

> Bilateral hand numbness; ? due to herniated disc.
>
> This patient has absolutely no significant mechanical
> or neurological signs referable to either nerve root
> compression, cord compression, or median or ulnar nerve
> entrapment[41].  In addition, he claims an EMG was done
> and this was entirely normal.  Although the MRI appears
> impressive, in the face of a complete lack of signifi-
> cant signs on the neural or orthopedic exams, I believe
> that a course of conservative treatment for a possible
> cervical disc is indicated.  I recommend over the door
> cervical traction with water bags, and Soma Compound[42]

(Tr. 134).

On April 12, 1989, Dr. Steinberger wrote to Dr. Wein-

berger stating that he had examined plaintiff on that date (Tr.

132).  Plaintiff was complaining of increased numbness in his

hand, with stiffness up his arms and down the sides of his trunk,

causing some difficulty writing.  He had no other "motor symp-

toms" nor "bladder/bowel disturbances" (Tr. 132).  Dr. Steinbe-

rger stated that plaintiff had a full range of motion of the neck

in all directions without any reproduction of his symptoms.  His

gait, station, heel, toe and tandem walk were normal and motor

---

[41]Entrapment refers to compression of a nerve or vessel by
adjacent tissue, such as the walls of fibrous or osseofibrous
tunnel, muscle, tendon, or other tissue.  See Dorland's at 635.

[42]Soma is the trademark for combination preparations of
carisoprodol, a centrally acting skeletal muscle relaxant for the
symptomatic management of acute, painful musculoskeletal
disorders, and aspirin.  See Dorland's at 301, 1759.

tests showed that he had excellent strength.  A sensory exam showed "decreased pin in a glove distribution[43] bilaterally in the upper extremities" and that his reflexes were "equal and symmetric as before" (Tr. 132).  His toes were "downgoing" and there was no "clonus[44]" (Tr. 132).

In this same letter, Dr. Steinberger noted that an MRI showed a herniated disc, prompting Dr. Steinberger to suggest that "admission for a myelogram followed by a CAT scan is indicated to definitively document the presence of significant cord compression" (Tr. 132).  He noted that plaintiff was hesitant to undergo the myelogram (Tr. 132).

### d.  Jamie Oravetz

Jamie Oravetz, a physical therapist associated with Dr. Liss, completed an initial physical therapy evaluation of plaintiff on March 3, 1988 (Tr. 139).  After detailing some of plaintiff's prior treatment, Oravetz reported that plaintiff's lower back pain had improved, though plaintiff felt he was "losing

---

[43]The Commissioner states that "glove anesthesia is a loss of feeling in the hands in the area which would be covered by gloves" (Def.'s Mem. in Supp. at 6), citing Attorney's Medical Dictionary G-96, Vol. 3.

[44]Clonus refers to alternate muscular contraction and relaxation in rapid succession or a continuous rhythmic reflex tremor initiated by the spinal cord below an area of spinal cord injury, set in motion by reflex testing.  See Dorland's at 379.

muscle girth on his lateral thoracic walls bilaterally" (Tr. 139).  Plaintiff also complained of pain between his shoulders which radiated "down the right thoracic paraspinals to the quadratus lumborum" (Tr. 139).  The pain was exacerbated by sneezing continuously, sitting in a slumped posture, sitting in a car for a long period, and standing up.  His recent x-rays "showed bone spurs between his shoulder blades" and he reported taking Naprosyn every ten days (Tr. 139).

Oravetz observed that plaintiff walked independently "without gait deviations" but had "increased lordosis[45] with slightly distended abdomen" (Tr. 139).  When sitting, he had "increased lumbar flexion[46], rounded shoulders and forward head" (Tr. 139).  He had normal muscle testing and range of motion except during "straight leg raises" (Tr. 139-40).  Plaintiff complained of decreased "hot-cold on the right lower extremity" and an occasional tingling sensation in his right upper extremity, mostly when lying down (Tr. 140).  Oravetz noted that plaintiff was mildly tender along the "right rhomboids and right quadratus lumborum" (Tr. 140).  The following tests were nega-

---

[45]Lordosis refers to a concave portion of the spinal column as seen from the side.  See Dorland's at 1090.

[46]Flexion refers to the act of bending or condition of being bent.  See Dorland's at 725.

26

tive:  straight leg raises, "cough, sneeze, Valsalva[47]" as well
as "Babinski[48]" and "clonus" (Tr. 140).  Oravetz also reported
that "[p]ositive facet t7-10, hip and SI joints [were] clear"
(Tr. 140).  He took note that plaintiff ran a television repair
shop, prepared paperwork and dealt with clients, but no longer
performed actual repairs.  His final assessment was that plain-
tiff presented with "myofascial pain in the right thoracic region
and possibly facets in the same region" and should continue with
physical therapy (Tr. 140).

    3.  Medications

    Plaintiff has taken several medications throughout the
Critical Period and thereafter.  He reported taking Hydrodiuril
for kidney stones (Tr. 133, 260), Naprosyn for pain (Tr. 139,

---

[47]Valsalva maneuver refers to either forcible exhalation
effort against a closed glottis (the vocal apparatus of the
larynx consisting of the true vocal cords and opening between
them); the resultant increase in intrathoracic pressure
interferes with venous (pertaining to the veins) return to the
heart, or forcible exhalation effort against occluded nostrils
and a closed mouth causes increased pressure in the eustachian
tube and middle ear, so that the tympanic membrane moves outward.
See Dorland's at 799, 1118, 2074.  It is unclear from the record
why Oravetz administered this test and what he hoped to learn
from it.

[48]Babinski reflex refers to dorsiflexion (flexing or bending
toward the extensor aspect of a limb) of the big toe on
stimulating the sole of the foot; normal in infants but in others
a sign of lesion in the central nervous system, particularly in
the pyramidal tract.  See Dorland's at 570, 1634.

215-16, 260, 313, 317, 441), Flexeril for inflamation (Tr. 482),
Zocor for triglycerides (Tr. 215, 260, 317), hydrochlorothiazide
for high blood pressure (Tr. 215, 317), allopurinol for gout[49]
(Tr. 215, 260, 317), Advil, Excedrin PM and Mineral Ice for pain
(Tr. 215), Ambien for sleeplessness (Tr. 260, 313, 317), and
Celebrex for arthritis and back pain (Tr. 441).

    4.  <u>Consultative Physicians</u>

      a.  <u>Dr. H. Furmin</u>

Dr. H. Furmin, a State Agency[50] physician, reviewed the
record following plaintiff's initial denial of benefits (Tr. 72).
On October 11, 1994, he completed an RFC report which indicated
that plaintiff was not disabled during the Critical Period.  He
concluded that plaintiff could lift or carry twenty pounds
occasionally and ten pounds frequently, sit, stand or walk for
six hours in a workday.  He had no postural, manipulative,

---

[49]Gout refers to a group of disorders of purine metabolism,
manifested by various combinations of (1) hyperuricemia; (2)
recurrent acute inflammatory arthritis induced by crystals of
monosodium urate monohydrate; (3) tophaceous deposits of these
crystals in and around the joints of the extremeties, which may
lead to crippling destruction of joints; and (4) uric acid
urolithiasis.  <u>See</u> <u>Dorland's</u> at 811.

[50]Both the ALJ (Tr. 29) and the Commissioner refer to Dr.
Furmin as a "State Agency" consultant but have not provided any
information identifying the agency (Def.'s Mem. in Supp. at 8).
The record does not provide any clarifying information.

visual, communicative or environmental limitations.  This report was "affirmed as written" by Dr. W. Wells[51] on November 22, 1994 (Tr. 72-79).[52]

    D.  Proceedings Before
       the ALJ

    a. <u>Plaintiff's Testimony</u>

The ALJ held a third and final hearing on November 3, 2004 at which plaintiff, David Crystal, a vocational expert, and Dr. John Hooper Griscom, a medical expert, testified.  Plaintiff was represented by counsel at the hearing.

After the ALJ detailed the procedural history of the case, plaintiff testified about his medical treatment (Tr. 481). He stated that Dr. Weinberger informed him that although he was plaintiff's cousin, he would not give plaintiff any special treatment because he would not risk losing his license (Tr. 484). Plaintiff's attorney stated, and plaintiff confirmed, that Dr.

---

[51]The only identifying information in the record regarding Dr. Wells is his stamp and note of affirmation on Dr. Furmin's RFC report (Tr. 79).  The Commissioner states that he affirmed these findings on November 22, 1994 (Def.'s Mem. in Supp. at 8).

[52]Dr. Marie Adam performed a consultative examination of plaintiff in 2003 (Tr. 259-64).  She prepared a report which detailed plaintiff's condition at that time.  Those portions of her report relevant to the Critical Period summarized the records of Drs. Steinberger and Liss, described above in Sections C.2.(b) and (c).

Weinberger concluded that plaintiff could not sit, stand or walk for more than two hours in a normal workday (Tr. 482). Plaintiff then testified that Dr. Weinberger referred plaintiff to Dr. Liss, who stated on September 18, 1995 that he was "disabled because of inability to sit more than three hours in a total workday, [and inability to] stand and walk three hours in a total workday" (Tr. 481-82).

Plaintiff testified that in 1988 he was being treated for a herniated disc in his neck, for which Dr. Weinberger prescribed Flexeril and Dr. Liss performed physical therapy (Tr. 482). Plaintiff also addressed Dr. Liss' notation that plaintiff was able to perform sit-ups, claiming that Dr. Liss subsequently informed him that he would not permit anybody with a herniated disc in his neck to do a sit-up, and opining that Dr. Liss' secretary must have mistakenly written otherwise (Tr. 482-83). When the ALJ asked plaintiff to clarify the "sit-up" type exercise that he described at the prior hearing, plaintiff stated that he never described such an exercise (Tr. 483, 488-89).

Plaintiff also discussed his treatment by Dr. Steinberger. He testified that Dr. Steinberger ordered an EMG which showed nerve damage in plaintiff's lower back that, in tandem with plaintiff's herniated cervical disc, caused numbness in his toes and hands (Tr. 483-84). Plaintiff further testified that

30

after Dr. Steinberger completed his neurological evaluation, he referred plaintiff back to Dr. Liss to continue his therapy (Tr. 484).

Plaintiff then discussed his physical limitations following his injury.  He testified that he did not think he could lift even three or four pounds, and he frequently dropped things due to the numbness in his fingers (Tr. 485).  Plaintiff also confirmed that he experienced pain in his lower back, neck, knees and hands, which he quantified as a nine on a scale of one-to-ten (Tr. 485).  He claimed to suffer "side effects" from his medication, but did not specify what they were (Tr. 485).

Plaintiff noted that he began receiving SSI benefits about a year and a half before the hearing date, and claimed that his condition in 2003 was equivalent to what it was "then," when he was also disabled (Tr. 485-86).

When asked if he could perform sedentary work, plain-tiff responded "I can't get out of bed in the morning . . . . I'm on medication . . . .  I get dizziness.  I sleep a lot on the couch" and claimed he could not perform any job during the Critical Period (Tr. 486-87).  He also claimed that he could not concentrate on television shows because he falls asleep, but that his memory was not impaired (Tr. 486-87).  He testified that he

31

felt depressed and took medication to deal with stress, but later
clarified that he was referring to physical stress (Tr. 487-88).

On redirect, plaintiff testified that he was told not
to carry anything in 1990, but he was able to carry items weigh-
ing less than five pounds (Tr. 511).  He further testified that
he did not have "good feeling" in his hands during the Critical
Period (Tr. 511).  He further stated that he had been able to
walk between twenty and thirty feet comfortably and stand for
approximately fifteen minutes (Tr. 512-13).  He claimed he could
not sit for long and had to lay down most of the time, and could
not bend, push, pull, kneel, crouch, reach, climb stairs or
perform any household chores (Tr. 513).  He could do some minimal
food shopping, but his life mostly consisted of laying on the
couch (Tr. 514).  He emphasized that he could not work in his
previous television repair job because it required lifting
televisions weighing thirty pounds or more (Tr. 515).

### b.  Dr. John Griscom

Next, Dr. Griscom, the medical expert, testified.  Dr.
Griscom interpreted Dr. Steinberger's March 31, 1989 report to
mean that Dr. Steinberger could not definitively determine
whether plaintiff's numbness was caused by a herniated disc (Tr.
489-90).  He noted that Dr. Steinberger had ruled out carpal

tunnel syndrome[53] and found that plaintiff's EMG was normal (Tr. 490).  Dr. Griscom also commented on Dr. Steinberger's April 1989 report in which he suggested a myelogram and CAT scan to determine if nerve pressure was causing plaintiff's bilateral numbness.  Dr. Griscom noted that it is unusual for a herniated disc to cause bilateral, as opposed to unilateral, numbness (Tr. 490-91).  As far as Dr. Griscom knew, the myelogram and CAT scan were never performed, in part, because plaintiff wanted to continue conservative therapy.  Dr. Griscom thought this wise because plaintiff was "80 percent better . . . with his hands" three or four months later and subsequently was "much, much better and basically the problem became a relatively minimal one" (Tr. 491).  When plaintiff felt "a little worse[,]" the next month, Dr. Steinberger considered a myelogram but chose conservative therapy after plaintiff's "negative neurologic examination" (Tr. 492).

Dr. Griscom also testified that plaintiff's records from 2003 and 2004 had no bearing on plaintiff's condition thirteen years earlier (Tr. 492).  He believed that plaintiff's condition had worsened throughout the 1990's, but that did not

---

[53]Carpal tunnel syndrome refers to a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow.  See Dorland's at 1850.

reflect on the Critical Period (Tr. 492-93).  He stated that "sometimes there can be a blurring of memory of symptomatology when you're dealing with a 20-year period of time" (Tr. 493).

Dr. Griscom then testified about plaintiff's physical limitations during the Critical Period.  He stated that he did not think that plaintiff "had a 12-month period of . . . meeting [the standard for an award of] disability" benefits and that plaintiff could have lifted twenty pounds occasionally and ten pounds often (Tr. 493-44).  Dr. Griscom further testified that plaintiff could sit and stand for six hours "as long as he could get up as desired" and "could stand, walk two hours[,]" but should have minimized "twisting, bending and squatting" and may have had trouble pushing and pulling (Tr. 493).  When asked about the numbness in plaintiff's hands, Dr. Griscom stated that he did not see much discussion of it in the records other than when Dr. Liss referred plaintiff to Dr. Steinberger.  He also emphasized that in September 1989 plaintiff's hands were "80 percent better" (Tr. 494).  He believed that plaintiff's symptoms were at their worst when plaintiff had told Dr. Steinberger that he had trouble writing, but Dr. Griscom did not "really see it in a severity degree really addressed [sic] after" Dr. Liss noted it was eighty percent better (Tr. 494).  He further testified that during the Critical Period, plaintiff's treatment only consisted of cervical

34

traction and physical therapy with Naprosyn and Flexeril (Tr. 496).

Dr. Griscom discussed plaintiff's ability to use his hands during the Critical Period. He believed that plaintiff may have had some dexterity problems when he first saw Dr. Steinberger, but that once plaintiff felt eighty percent better, he would have been "able to do most things reasonably" (Tr. 496). He believed the issue was a sensory, not motor, problem because Dr. Liss had reported on February 29, 1988 that plaintiff's motor function was normal. He also noted that the first record of numbness in plaintiff's hands was made on March 31, 1989 (Tr. 496-97). Previously, there had only been mention of some inconsequential numbness in plaintiff's left leg (Tr. 497).

Based on his findings, Dr. Griscom concluded that at no time during the relevant period did plaintiff meet or medically equal any of the orthopedic listings which are considered by the agency to be presumptively disabling (Tr. 498). Moreover, Dr. Griscom would not have placed any limitations on plaintiff with respect to the "repetitive use of the upper extremities for moving relatively small items" (Tr. 498). He believed that plaintiff was able to sit for six hours, stand and walk for two hours and should have been able to get up and down as desired and change positions as necessary (Tr. 499). When asked if plaintiff

would have had to leave a workstation to accomplish this change in position, Dr. Griscom stated that plaintiff's back or neck might have "tighten[ed] up" but he could simply shift in his chair or stretch to remedy this (Tr. 499).  Dr. Griscom would have had plaintiff minimize twisting, bending and squatting, and avoid jobs which emphasized these postural movements because "he seem[ed] to have some chronic facet discomfort in the thoracic spine" which Dr. Liss thought was most likely caused by lack of exercise (Tr. 499-501).

Dr. Griscom explained that plaintiff's MRI was normal and after he gained weight, his fuller abdominal wall pulled on part of his spine (Tr. 501).  He testified that abdominal strengthening exercises would usually be prescribed for plain-tiff's condition and pointed out that, because plaintiff had no persistent back pain or cervical symptoms when he first met with Dr. Liss, these exercises would have been appropriate (Tr. 501-02).  He did not know if plaintiff completed such exercises or if Dr. Liss recommended any alternatives (Tr. 502).

Dr. Griscom additionally noted that Dr. Liss did not know that plaintiff had a ruptured disc when he mentioned plain-tiff's sit-ups in 1988 because the cervical herniated disc was

not discovered until plaintiff's 1989 MRI and plaintiff's prior
CAT scan in 1985 was negative[54] (Tr. 494-95).

On cross examination, Dr. Griscom testified that the
only category of "list[ed]" maladies that could apply to plain-
tiff was that related to "spinal disorders[,]" but that listing
would not apply because his symptoms were relieved by Naprosyn
(Tr. 503-04).  He also noted that Naprosyn rarely causes drowsi-
ness and he had never seen that side effect from Advil or Excedr-
in (504-05).  He noted that it was more likely that Flexeril made
plaintiff drowsy, which he could have taken at night or substi-
tuted entirely with another muscle relaxant (Tr. 505).

When asked about Dr. Weinberger's RFC report from 1996,
Dr. Griscom testified that he believed Dr. Weinberger's assess-
ment of plaintiff's limitations was exaggerated (Tr. 506-07).  He
pointed out that Dr. Weinberger did not have any "actual office
care notes" but provided only summaries of plaintiff's care by
other physicians (Tr. 506-07).  Dr. Griscom also took issue with
Dr. Liss' 1995 RFC report because plaintiff's condition was worse
in the 1990's than during the Critical Period (Tr. 508).  Fi-
nally, Dr. Griscom testified that he believed plaintiff could
have performed sedentary work, defined at the hearing as "essen-

---

[54]Dr. Griscom also noted that plaintiff had a negative MRI
of the lumbar spine in 2000 (Tr. 495).

37

tially sitting, occasional standing . . . answering a phone" (Tr. 510).

c.   David Crystal

David Crystal, a vocational expert, testified regarding plaintiff's ability to work during the Critical Period, noting that plaintiff's previous work required medium exertion (Tr. 516).  The ALJ asked Crystal to assume a forty-six or forty-seven year old individual with plaintiff's educational and vocational background who could lift twenty pounds occasionally, walk or stand in combination for two hours and sit for six hours in a workday, needing the opportunity to get up and stretch periodically.  He added that this individual had the postural limitations described by Dr. Griscom, but no limitation on the repetitive use of his upper extremities to manipulate small objects (Tr. 517).  Crystal testified that such a person would have transferable skills for record keeping, customer service, assembly and work with small tools (Tr. 517).  Crystal cited several examples of positions utilizing these skills, including a check cashier, of which there were 200,000 nationally and 4,000 in Tricounty South Florida[55], and an information clerk, of which there

---

[55]Between 1994 and 2004, it appears from the record that
(continued...)

38

were 83,000 nationally and 400 in Tri-county South Florida, a
traffic clerk, of which there were 53,000 nationally and 1200 in
Tri-county South Florida (Tr. 518-19).  He testified that these
jobs existed during the Critical Period (Tr. 523).

On cross examination, plaintiff asked if this hypothet-
ical person could work if he also had bilateral numbness in the
first and second fingers of each hand (Tr. 520).  Crystal testi-
fied that he could still perform sedentary work because the
Social Security regulation which mandates the use of both hands
for such work would not apply to plaintiff because his hands were
still functioning (Tr. 520).  However, he further testified that
if his dexterity and manipulation of fine objects was lacking,
plaintiff would not be able to perform the full range of seden-
tary work Crystal had described (Tr. 521).  Crystal also stated
that a man who could sit, walk and stand only two hours per day
could not perform those jobs (Tr. 522).  He then testified that a
person who could only lift and carry five pounds would not be
able to perform many of these jobs (Tr. 522).  Finally, Crystal

---

[55](...continued)
plaintiff initially resided in New York primarily.  At some
point, plaintiff moved to Florida, but subsequently returned to
New York.  The record does not specify the dates of these moves.
It appears that the vocational expert addressed the availability
of jobs in Tri-county South Florida because that is where
plaintiff was residing at the time of the expert's testimony.

testified that a person who can lift or carry five pounds, sit
and stand for two hours in a workday, who has the pain plaintiff
described and has to lie down after taking medication, could not
work at all (Tr. 522-23).

III.  <u>Analysis</u>

    A.  Applicable Legal
       <u>Principles</u>

        1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008);
<u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw v.
Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Tejada v. Apfel</u>, 167
F.3d 770, 773 (2d Cir. 1999); <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181
(2d Cir. 1998).  The Court first reviews the Commissioner's
decision for compliance with the correct legal standards; only
then does it determine whether the Commissioner's conclusions
were supported by substantial evidence.  <u>Tejada v. Apfel</u>, <u>supra</u>,
167 F.3d at 773; <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir.
1987); <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y.

2009) (Marrero, D.J.); Santiago v. Barnhart, 441 F. Supp. 2d 620, 625 (S.D.N.Y. 2006) (Marrero, D.J.).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." Ellington v. Astrue, supra, 641 F. Supp. 2d at 327-28; accord Johnson v. Bowen, supra, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, supra, 817 F.2d at 986.

　　　　2.  Determination of
　　　　　　 Disability

　　　　Under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., a claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be

41

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and subjective factors when assessing a disability claim, including: (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) subjective evidence of pain and disability to which the claimant and family or others testify; and (4) the claimant's educational background, age and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983).

"In evaluating disability claims, the [Commissioner] is required to use a five-step sequence, promulgated in 20 C.F.R. §§ 404.1520, 416.920."  <u>Bush v. Shalala</u>, 94 F.3d 40, 44 (2d Cir. 1996).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where . . . the claimant is not so engaged, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to do basic work activities . . . . Where the claimant does suffer a severe impairment, the third inquiry is whether, based solely on medical evidence, he has an impairment listed in Appendix 1 of the regulations or equal to an impairment listed there . . . . If a claimant has a listed impairment, the Commissioner considers him disabled.  Where a claimant does not have a listed impairment, the fourth inquiry is whether, despite his severe impairment, the claimant has the residual functional capacity to perform his past work . . . .  Finally, where the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

<u>Balsamo v. Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998); <u>see also</u> <u>Barnhart v. Thomas</u>, 540 U.S. 20, 24-25 (2003); <u>Butts v. Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended</u> <u>on</u> <u>other</u> <u>grounds</u> <u>on</u> <u>rehearing</u>, 416 F.3d 101 (2d Cir. 2005); <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Shaw v. Chater</u>, <u>supra</u>, 221 F.3d at 132; <u>Brown v. Apfel</u>, <u>supra</u>, 174 F.3d at 62; <u>Tejada v. Apfel</u>, <u>supra</u>, 167 F.3d at 774; <u>Rivera v. Schweiker</u>, <u>supra</u>, 717 F.2d at 722.

Step four requires that the ALJ make a determination as to the claimant's residual functional capacity.  See Sobolewski v. Apfel, 985 F. Supp. 300, 309 (E.D.N.Y. 1997).  RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ makes a "function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch." Sobolewski v. Apfel, supra, 985 F. Supp. at 309.  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work, and may be categorized as sedentary,[56] light,[57] medium, heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

---

[56]Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday.  SSR 96-9p, 1996 WL 374185 at *3 (1996); see 20 C.F.R. §§ 404.1567(a), 416.967(a).  Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. §§ 404.1567(a), 416.967(a).

[57]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds."  20 C.F.R. § 404.1567(b).  Light work often "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Burgess v. Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra, 335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than the claim-ant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly re-ferred to as "the Grid."  The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl, D.J.).  When a claimant retains the RFC to perform at least one of the categories of work listed on the Grid, and when the claimant's educational background and other characteristics are also captured by the Grid, the ALJ may rely exclusively on the Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work.  Butts v. Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the

45

Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the [Grid]).") (internal quotation and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "limit the range of sedentary work that the claimant can perform." Butts v. Barnhart, supra, 388 F.3d at 383, quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation omitted); Bapp v. Bowen, supra, 802 F.2d at 603. When a claimant suffers from a non-exertional limitation such that she is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84; see 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

46

### 3.  Treating Physician Rule

When considering the evidence in the record, the ALJ is required to give deference to the opinions of a claimant's treating physicians.  Under the regulations' "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 404.1527(d)(2); Shaw v. Chater, supra, 221 F.3d at 134; Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  Before giving a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given.  These factors include:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical support for the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(1)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at

47

*16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and
Recommendation of Freeman, M.J.); <u>Matovic v. Chater</u>, 94 Civ. 2296
(LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan 12. 1996) (McKenna,
D.J.).  "[G]ood reasons" must be given for declining to afford a
treating physician's opinion controlling weight.  20 C.F.R.
§ 404.1527(d)(2); <u>Schisler v. Sullivan</u>, <u>supra</u>, 3 F.3d at 568;
<u>Burris v. Chater</u>, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n.3
(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

    4. Development of
     <u>the Record</u>

  "It is the rule in the [Second C]ircuit that 'the ALJ,
unlike a judge in a trial, must [him]self affirmatively develop
the record' in light of 'the essentially non-adversarial nature
of a benefits proceeding.'"  <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d
Cir. 1996), <u>quoting</u> <u>Echevarria v. Sec'y of Health & Human Servs.</u>,
685 F.2d 751, 755 (2d Cir. 1982).

    Because a hearing on disability benefits is a non-
    adversarial proceeding, the ALJ generally has an affir-
    mative obligation to develop the administrative record.
    <u>Echevarria v. Secretary of Health & Human Servs.</u>, 685
    F.2d 751, 755 (2d Cir. 1982).  This duty exists even
    when the claimant is represented by counsel . . . .
    The [Commissioner's] regulations describe this duty by
    stating that, "[b]efore we make a determination that
    you are not disabled, we will develop your complete
    medical history . . . [and] will make every reasonable
    effort to help you get medical reports from your own

> medical sources when you give us permission to request
> the reports."  20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) ("We have stated many

times that the ALJ generally has an affirmative obligation to

develop the administrative record . . . .") (internal quotations

and citation omitted); Shaw v. Chater, supra, 221 F.3d at 131

("The ALJ has an obligation to develop the record in light of the

non-adversarial nature of the benefits proceedings, regardless of

whether the claimant is represented by counsel."); Tejada v.

Apfel, supra, 167 F.3d at 774 (same); Van Dien v. Barnhart, 04

Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006)

(Castel, D.J.) (same); Molina v. Barnhart, 04 Civ. 3201 (GEL),

2005 WL 2035959 at *6 (S.D.N.Y. Aug. 17, 2005) (Lynch, D.J.)

(same).  The regulations state that "[w]hen the evidence we

receive from your treating physician . . . or other medical

source is inadequate for us to determine whether you are dis-

abled, . . . [w]e will first recontact your treating physician

. . . or other medical source to determine whether the additional

information we need is readily available."  20 C.F.R. § 404.-

1512(e); see also Perez v. Chater, supra, 77 F.3d at 47.  Where

the ALJ has failed to develop the record adequately, remand to

the Commissioner for further development is appropriate.  See
Pratts v. Chater, supra, 94 F.3d at 39.

    B.  Evaluation of the
       ALJ's Decision[58]

      In his decision, the ALJ first noted that plaintiff met
the disability insured status requirements of the SSA on December
23, 1985, the alleged onset date of his disability, and continued
to meet these requirements through March 31, 1990 (Tr. 28).  The
ALJ then applied the five-step analysis and determined, based on
medical evidence and plaintiff's testimony, that:  (1) plaintiff
had not engaged in substantial gainful activity since December
23, 1985, (2) plaintiff had a combination of severe impairments,
namely mild degenerative disc disease of the cervical spine with
a herniated disc at C4-5, and (3) although plaintiff suffered
from severe impairments, they did not, either singly or in
combination, meet or medically equal one of the listed impair-
ments in 20 C.F.R. § 404.1520(d) (Tr. 28-29).  Plaintiff never
claimed to have an impairment of listing severity (Tr. 28).

---

[58]Because plaintiff does not indicate in his complaint that
he objects to any specific aspects of the ALJ's decision, I shall
consider each of the steps in the ALJ's analysis that supported
the conclusion that plaintiff was not disabled.

At step four, the ALJ drew on substantial evidence in the record to support his conclusion that plaintiff had the RFC "for work as follows:  able to lift 20 pounds, able to stand and walk up to 2 hours, able to sit up to 6 hours, able to occasionally twist, bend, or squat, and able to use the upper extremities for repetitive movements" (Tr. 30).  This finding was supported by the record and "objective medical evidence from the treating sources does not show any abnormalities that suggest otherwise" (Tr. 30).

As the ALJ noted, a State Agency[59] medical consultant determined that plaintiff could perform the exertional requirements needed for this level of work (Tr. 29).  The consultant physician found that plaintiff could lift twenty pounds occasionally, lift ten pounds frequently, stand and/or walk for six hours, and sit for six hours in an eight hour workday (Tr. 29, 72-79).  The ALJ gave great weight to this opinion because it was supported by the medical evidence and was consistent with the record (Tr. 29).

Moreover, as noted by the ALJ, Dr. Griscom, who had made a "careful analysis of [plaintiff's] impairments[,]" also determined that plaintiff had this RFC during the Critical Period

---

[59]Again, neither the Commissioner nor the ALJ have specified the "State Agency" with which the medical consultant worked.

(Tr. 30).  The ALJ emphasized that Dr. Griscom's testimony was
"based on a thorough review of the evidence and his extensive
knowledge of and experience in the field of medicine" and "his
determinations are credible because they are supported by objec-
tive medical findings and treating progress notes in the record"
(Tr. 30).  Specifically, Dr. Griscom testified that on March 31,
1989, Dr. Steinberger did not appear to know exactly what caused
plaintiff's symptoms, but surmised that his bilateral hand
numbness might be due to a herniated disc.  Plaintiff's EMG was
normal (Tr. 30).  In addition, as Dr. Griscom testified, when Dr.
Steinberger saw plaintiff on April 12, 1989, plaintiff had full
range of motion in his neck.  At that time, Dr. Steinberger
recommended a myelogram and CT scan.  The ALJ emphasized Dr.
Griscom's statement that plaintiff was wise not to undergo these
tests because, as reported by Dr. Liss on September 15, 1989,
plaintiff's hand symptoms improved by eighty percent soon after
(Tr. 30).  The ALJ also noted Dr. Griscom's testimony that
plaintiff's most recent medical records, showing a decline in
plaintiff's health, do not "shed any light on" plaintiff's
condition prior to March 1990 (Tr. 30).

     In further support of his determination, the ALJ cited
Dr. Griscom's testimony that plaintiff's neurological deficits
were sensory only and did not interfere with the use of his

52

extremities.  Moreover, medical records indicated plaintiff's pain was relieved with Naprosyn without adverse side effects other than the alleged drowsiness, and that the drowsiness could be avoided by taking Flexeril at night or another muscle relaxant altogether.

The ALJ rejected the opinion of Dr. Liss, plaintiff's treating physician, regarding plaintiff's limitations in perform-ing work-related activities (Tr. 29).  Though the ALJ does not explicitly cite to an exhibit containing these findings, it appears that he was referring to the RFC report Dr. Liss prepared on September 18, 1995 (Tr. 508).  I have been unable to locate this report in the administrative record, but plaintiff's counsel stated at the hearing that Dr. Liss had found that plaintiff "could sit three hours in a total workday and stand, walk a total of three hours in a workday" (Tr. 508).  This conclusion was not supported by substantial evidence.  First, Dr. Griscom testified that the opinions of Drs. Weinberger and Liss that plaintiff had an RFC for less than sedentary work were not supported by the record (Tr. 30).  As the ALJ noted, Dr. Liss' opinion was incon-sistent with his own examinations and was not supported by any other objective medical findings or treating progress notes (Tr. 29).  The ALJ specifically noted that "Dr. Liss' reports indicate that the [plaintiff] responded well to treatment" and Dr. Steinb-

erger reported on March 31, 1989 that plaintiff had "'absolutely
no significant mechanical or neurological signs referable to
either nerve root compression, cord compression, or median or
ulnar nerve entrapment'" (Tr. 29).  Accordingly, the ALJ found
that Dr. Liss' conclusions appeared to be based on plaintiff's
subjective complaints, not objective medical findings (Tr. 29).
Moreover, it is not clear whether Dr. Liss' report even purported
to describe plaintiff's abilities during the Critical Period, or
described his condition in 1995.

          Although the ALJ's failure to adopt the treating
physician's conclusion was supported by substantial evidence
inconsistent with the treating physician's conclusion, see 20
C.F.R. § 404.1527(d)(2), the ALJ is still required to apply a
series of specific factors in order to determine the weight to
give Dr. Liss' opinion.  These factors include:  (1) the length
of the treatment relationship and the frequency of examination;
(2) the nature and extent of the treatment relationship; (3) the
medical support for the treating physician's opinion; (4) the
consistency of the opinion with the record as a whole; (5) the
physician's level of specialization in the area and (6) other
factors that tend to support or contradict the opinion.  20
C.F.R. § 404.1527(d)(1)-(6); Schisler v. Sullivan, supra, 3 F.3d

54

at 567; Mitchell v. Astrue, supra, 2009 WL 3096717 at *16;

Matovic v. Chater, supra, 1996 WL 11791 at *4.

The ALJ's opinion contains no explicit indication that

he considered any of these factors, other than the fourth and

perhaps the sixth, in deciding not to give controlling weight to

Dr. Liss' opinion concerning plaintiff's ability to work.

Violation of the treating physician rule can be a basis for

remand.  Halloran v. Barnhart, 362 F.3d at 28, 33 (2d Cir. 2004)

("We do not hesitate to remand when the Commissioner has not

provided 'good reasons' for the weight given to a treating

physician[']s opinion and we will continue remanding when we

encounter opinions from ALJ[]s that do not comprehensively set

forth reasons for the weight assigned to a treating physician's

opinion."); accord Rivas v. Barnhart, supra, 2005 WL 183139 at

*27.  In this case, however, the point on which the ALJ appar-

ently contravened the treating physician rule is not dispositive.

Dr. Liss' 1995 RFC report was prepared five years after the close

of the Critical Period and there is no indication that it ad-

dressed plaintiff's condition during that time.  Plaintiff's RFC

in 1995 has no bearing on his ability to work during the Critical

Period and is therefore not relevant[60].

_____

[60]The Commissioner states that the ALJ "erroneously
                                           (continued...)

The ALJ also concluded that plaintiff's own statements concerning his impairments and ability to work were "not entirely credible in light of the [plaintiff's] own description of his activities and lifestyle, the degree of medical treatment required, the reports of treating and examining practitioners, and the findings made on examination" (Tr. 29).  In making this determination, the ALJ highlighted several portions of plaintiff's testimony.  The ALJ first noted plaintiff's statement that, though Dr. Weinberger is his cousin, he "would not risk his medical license by giving false testimony" and had told plaintiff that he could sit or walk for two hours per day (Tr. 29).  He also noted plaintiff's testimony that Dr. Liss treated him for herniated discs in his neck, prescribed Flexeril and physical therapy and concluded that he was disabled in 1995.  The ALJ further noted plaintiff's testimony that Dr. Steinberger ordered an EMG that showed nerve damage in plaintiff's lower back.  At that time, plaintiff alleged numbness in his toes and was referred back to Dr. Liss for physical therapy (Tr. 29).  He also

---

[60](...continued)
attributed" this RFC report to Dr. Liss when Dr. Weinberger was actually the author (Def.'s Mem. in Supp. at 19).  If this statement is accurate, the ALJ's dismissal of the opinion is even less problematic since Dr. Weinberger was not truly a treating physician.  Because the record is unclear, I will assume that the report was prepared by Dr. Liss and is therefore subject to the treating physician rule.

highlighted plaintiff's claims that he could lift only three to four pounds, that his pain equaled a nine on a one-to-ten scale, that his condition was the same at the time of the hearing as it was on December 23, 1985 and that he had adverse side effects from his medication (Tr. 29).  Finally, he noted plaintiff's testimony that he could not perform sedentary work because he could not concentrate and often fell asleep, and that he took medication to deal with stress causing muscle spasms (Tr. 29).

The ALJ's conclusion that plaintiff's subjective complaints were not entirely credible was supported by substantial evidence (Tr. 30).  The ALJ stated the applicable law for analyzing plaintiff's subjective complaints, noting that there must be:

> 1.  evidence of an underlying medical condition and
>
> 2.  either (a) objective medical evidence that confirms the severity of the alleged [symptom] arising from that condition or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged [symptom].

(Tr. 31), quoting 42 U.S.C. § 423(d)(5).  The ALJ noted that this standard was designed primarily to evaluate complaints of pain, but that "it is clear that it applies to other subjective conditions" (Tr. 31).  He also relied on 20 C.F.R. § 404.1529 and Social Security Ruling 88-13, which mandate that he consider:

(1) the nature, location, onset, duration, frequency, radiation and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness and adverse side effects of any pain medication; (4) treatment, other than medication, for the relief of pain; (5) functional restriction; and (6) the claimant's daily activities (Tr. 31).

In applying these standards, the ALJ found that although there is evidence of an underlying medical condition, plaintiff had "failed in his burden to show that requirements of the second prong of the statutory test are present" because the "objective findings do not confirm the severity of the condition, and the condition is not of such a severity as to reasonably be expected to give rise to the symptoms alleged" (Tr. 31). Specifically, the ALJ noted that plaintiff claimed he could not work throughout the Critical Period due to cervical, thoracic and lumbar pain and hand numbness, but the medical records do not support such limitations (Tr. 31). To the extent Dr. Weinberger's records support plaintiff's claims, they are given little weight because they are largely summaries of other doctors' reports, and do not reflect treatment notes. Likewise, though "Dr. Weinberger submitted a narrative report, dated September 2, 1994, indicating treatment since March 1977, the record does not

contain any treating records prior to February 1988" when Dr. Liss first treated plaintiff for leg and thoracic pain (Tr. 31).

Plaintiff's actual treatment records also fail to support his subjective complaints.  As the ALJ stated, when plaintiff first saw Dr. Liss in February 1988, he had "a normal neurological examination except for some diminished sensation in the right leg of questionable significance" (Tr. 31).  Dr. Liss noted that his pain "could be due to 'inactivity, lack of exercise, and paucity of treatment'" and prescribed physical therapy (Tr. 31).  In March 1988 "it was noted that [plaintiff] was performing sit-ups and only experiencing a fraction of his original pain" and was advised to continue physical therapy and increase physical exercise.  Plaintiff did not, however, seek treatment for the next year (Tr. 31-32).

The ALJ noted that in March 1989, plaintiff complained of "increased symptoms along his spine and tingling and numbness in the upper extremities" (Tr. 32).  An MRI showed a herniated disc in his cervical spine and "mild degenerative changes at C6-7 and C56- with mild stenosis[,]" but his EMG was normal (Tr. 32).  Plaintiff was again prescribed only conservative treatment including Flexeril and physical therapy, and surgery was never recommended.  The ALJ also noted that progress notes indicated plaintiff had significant improvement concerning the numbness in

59

his upper extremity, and that plaintiff claimed to be "'80%
better'" in September 1989 (Tr. 32).  He also noted that plain-
tiff did not complain of any side effects from his medications to
any treating physicians, and while on March 19, 1990, he com-
plained of "persistent thoracic pain[,]" he also reported that
his cervical and lumbar pain had improved (Tr. 32).  Besides
tenderness to palpation along the parathoracic muscles, his
examination at that time was normal.  He had no neurological
deficits through March 1990, his thoracic MRI scan was normal and
he continued to receive only conservative treatment with physical
therapy (Tr. 32).  These treatment records do not support plain-
tiff's claims that he could not work and could barely move from
the couch, and undermine his credibility.

          The ALJ also concluded that plaintiff's activities
further undermined his claimed inability to work (Tr. 32).  The
ALJ specifically cited plaintiff's ability to drive a car, visit
others, take out the garbage, retrieve mail, grocery shop and
visit a social club (Tr. 32).  In light of this evidence and
plaintiff's treatment records, plaintiff's contentions "were not
supported by clinical or laboratory findings establishing impair-
ments which reasonably could be expected to cause such limita-
tions" and "were inconsistent with other evidence and the overall

evidence did not persuasively establish excess pain or greater limitations" (Tr. 32).

The ALJ directly addressed the effect of plaintiff's credibility in making his assessments, finding plaintiff's "description and allegations of <u>total</u> disability [not] to be credible" (Tr. 32).  An ALJ's assessment of a claimant's credibility is proper when a claimant asserts eligibility based on subjective evidence (Tr. 32).  The ALJ noted that in making this determination, he must "carefully weigh the testimony given, and in doing so, consider all the circumstances under which the claimant has testified" (Tr. 32).  He further noted that "prevailing case decisions" mandate that he must "articulate a reason for questioning credibility" and "where [the] agency's credibility determination is crucial to the reviewing court's conclusion under the substantial evidence rule, the [ALJ] must make a sufficient finding as to the witness' credibility" and state reasons for its rejection (Tr. 32).  <u>See</u> SSR 96-7p, 1996 WL 374186 at *1-8 (July 2, 1996).

In this case, the ALJ listed three reasons for rejecting plaintiff's claim of total disability:  plaintiff's manner and demeanor failed to convey convincing credibility, his range of daily activities did not support an inability to perform work in accordance with the RFC determined by the ALJ, and plaintiff's

testimony was "contradictory to and inconsistent with the medical evidence of record" (Tr. 33).

To the extent the ALJ's RFC findings rested on his determination of plaintiff's credibility, it was "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995) (Leisure, D.J.); accord Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994 at *6 n.97 (S.D.N.Y. Dec. 14, 2009) (Scheindlin, D.J.); see Aponte v. Sec'y, Dep't. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.") Accordingly, I defer to the ALJ's conclusion because he assessed plaintiff's credibility consistent with the governing law.

I will add, however, that there are many instances of inconsistent testimony from plaintiff in the record. For example, plaintiff often claimed he stopped working immediately following his injury, but he reported inconsistently concerning

the date of the injury, sometimes claiming it occurred in 1985 and other times in 1986 (see e.g. Tr. 104, 123, 308).  Notwith-standing the foregoing testimony, plaintiff also testified that he told Dr. Steinberger that he maintained his usual state of health until March 1989 (Tr. 133) and told Oravetz that in March 1988 he had been working in his television repair shop doing clerical work (Tr. 140).  At another point, plaintiff testified that he "lost feeling in [his] right leg in Nov. 1985" -- one month before his injury occurred (Tr. 89).  Plaintiff's descrip-tion of his symptoms and limitations was also inconsistent.  He claimed he was able to drive and visit with friends (Tr. 91), but also stated that his life largely consisted of lying on the couch (Tr. 513-14).  His claims were also incongruous with the fact that he did not see Dr. Liss for his 1985 injuries until 1988, and then did not return to him for one year.  Such inconsisten-cies pepper the record, and further support the ALJ's negative finding concerning plaintiff's credibility.

At step five, the ALJ concluded, based on expert testimony regarding plaintiff's RFC, combined with his age, education and work experience, that plaintiff could perform work other than his past relevant work, which was precluded by his impairments (Tr. 33).  Accordingly, plaintiff had "established a prima facie case of disability and the burden ha[d] shifted to

63

the Commissioner to show that there are other jobs in the na-
tional economy that he can perform" (Tr. 33).  The ALJ noted that
the vocational expert testified that a hypothetical individual
with plaintiff's RFC could work as a check cashier, traffic clerk
and information clerk, all of which existed in significant
numbers in the national and regional economy.  The ALJ accepted
this testimony because it was based on a hypothetical supported
by the evidence, and the expert's "extensive knowledge of and
experience in the local, regional and national job markets" and
showed "careful analysis of [plaintiff's] impairments and limita-
tions" (Tr. 33).  The fact that plaintiff "had acquired skills in
prior work that were transferable to sedentary jobs abundant in
the national economy satisfied the [Commissioner]'s burden of
showing the existence of alternative substantial gainful employ-
ment suited to [plaintiff's] physical and vocational capabili-
ties." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983).

        The ALJ also took note of plaintiff's hypothetical
which asked:

            [W]hether a person with the same age, education and
            vocational profile as [plaintiff] with the residual
            functional capacity for work as follows:  able to lift
            5 pounds occasionally, able to stand and walk up to 2
            hours, able to sit up to 2 hours, able to occasionally
            twist, bend, or squat, and limited by bilateral numb-
            ness in the first and second fingers of each hand,
            could perform any occupations existing in the national
            economy

(Tr. 33-34) (emphasis in original).  The vocational expert
responded that such a person could not perform plaintiff's past
relevant work nor any work existing in significant numbers in the
national economy (Tr. 34).  However, the ALJ did not accept
counsel's hypothetical because none of his added limitations were
supported by the record.  Indeed, plaintiff referenced RFC
assessments from September 1995, October 1996 and June 1997 in
support of his hypothetical, but the additional limitations were
not supported by the record prior to March 31, 1990 (Tr. 34).
The ALJ noted that the medical expert had testified that "current
medical records could not be used to project back to the relevant
period" and that plaintiff's condition had become progressively
worse over time (Tr. 34).  Because the expert was cross-examined
and his testimony was consistent with the medical records for the
Critical Period, his opinion was accepted (Tr. 34).

        The ALJ appropriately concluded that there were a
significant number of jobs in the national economy that plaintiff
could have performed despite his limitations.  Based upon this
analysis, the ALJ found that plaintiff had not been under a
disability within the meaning of the SSA during the Critical
Period (Tr. 34).

        Accordingly, I conclude that the ALJ's determination
that plaintiff was not disabled under the SSA is supported by

substantial evidence in the record that was before him.  More-
over, I find that the Commissioner applied the applicable law
correctly.  Though plaintiff claimed generally that the Commis-
sioner's decision "was erroneous, not supported by substantial
evidence on the record, and/or contrary to law[,]" he has not
pointed to any specific part of the opinion which was erroneous,
and I have found none in my review (Compl. ¶ 9).

IV.  Conclusion

        Accordingly, for all the foregoing reasons, I respect-
fully recommend that the Commissioner's motion for judgment on
the pleadings be granted and that the complaint be dismissed.

V.  Objections

        Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from the date of this Report to file written
objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the chambers of the Honorable
Deborah A. Batts, United States District Judge, 500 Pearl Street,
Room 2510, New York, New York 10007, and to the chambers of the
undersigned, 500 Pearl Street, Room 750, New York, New York

66

10007.  Any requests for an extension of time for filing objec-

tions must be directed to Judge Batts.  FAILURE TO OBJECT WITHIN

FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL**

PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140 (1985);

United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997);

IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054

(2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.

1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.

1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        May 17, 2011

                                   Respectfully submitted,


                                   HENRY PITMAN
                                   United States Magistrate Judge



Copies mailed to:

Mr. Bert Cohen
P.O. Box 14
New City, New York 10956

Leslie Ramirez-Fisher, Esq.
United States Attorneys Office
3rd Floor
86 Chambers Street
New York, New York 10007